The question before the court is whether or not Washington v. Harper, which determined the rights of a convicted felon committed to the long-term custody of the state for both punishment and correction, whether that case controls the outer boundaries of the procedures and the substantive rights of Jared Loughner, a pretrial detainee. Before you get too far into that, it seemed to me a more narrow issue is whether or not the regulation before us is constitutional. There's a lot of other issues that are involved, but aren't we really going to decide in the end a very much more narrow issue than the one you put to us? Well, Your Honor, I don't think that's necessarily the case because the administrative procedure could be a precursor to the proper judicial review. I don't know what that means. It could be the means by which the Bureau of Prisons decides whether or not it wishes to come before the district court and ask for permission to medicate a pretrial detainee. It could be just a part of their internal procedures, but not the ultimate decision as to whether or not that individual would be medicated. So I don't think the court needs to find the regulation unconstitutional in order to verify it. But if we find the regulation unconstitutional, you win. Absolutely. If we find it constitutional, then if they met the regulation, they win. Well, no, we would – the reason I don't think that's the case is I think it's possible to take the regulation as simply an internal administrative decision-making process and that it's still necessary for the Bureau of Prisons to come before this court – I'm sorry, the district court – and ask the district court for permission to go forward. So you think there's some law, constitutional law, in addition to the regulation that they have to live up to? We think that Riggins provides the standard. Riggins v. Nevada provides the standard that must be met, both substantive and procedural, before an individual can be medicated. Assuming they need to come to court. Yes. In terms of the precedent, why isn't the best view of the precedent taken altogether, that the Supreme Court has never actually decided this issue directly, that there are pertinent considerations in various cases, and that we ought to be looking at the competing interests as slightly different – somewhat different as they would be either for a convicted felon as to whom the issue was dangerousness or for a pretrial person as to whom the issue was competence, directly, and look at the various opinions, considerations, and decide it essentially without trying to plug this instance directly into one hole or the other? Well, Your Honor, we certainly agree that the Supreme Court hasn't directly decided this issue. It's not our position that there's a single case that mandates a result. But I do think the Supreme Court has spoken fairly extensively on the subject and has given a great deal of guidance, and it's our belief that guidance comes principally from Riggins and Sell. Those are the two cases in which the Supreme Court actually considered the circumstances under which a pretrial detainee might be medicated. And, of course, in Riggins, the Court said Harper did not decide the circumstances, the substantive standard under which a pretrial detainee could be medicated. Yes, and it certainly gets you that far, but what's the answer in Riggins? Well, we think the answer is set forth in the standard that they postulate, perhaps not directly as a ruling, but they certainly postulate that the standard is whether or not the treatment proposed is medically appropriate and considering less intrusive means essential to the safety of the individual or others. That same standard gets repeated in Sell when Sell is discussing this. But I gather your real issue at this point, the one you really care about, is who's doing the hearing and how. Well, both issues are important to us. I think robust procedures without a robust substantive standard I don't think is meaningful, but we do believe that the procedures are also necessary. And certainly the Supreme Court has spoken only obliquely to that, and I think this Court is going to have to refer to the Matthews v. Eldridge balancing test in reaching a firm conclusion about that. But we've laid out the reasons we think that the procedural posture really is different and that the Matthews calculus leads you to a different result here. And that's principally the difference in private interests involved, that Mr. Laughner is not a convicted felon, that he has not had his right to avoid correction and treatment extinguished by a conviction, that the state doesn't have him in long-term custody with a concomitant right to treat him, to correct him, to rehabilitate him, and that he has fair trial rights which are outstanding and which may be grievously harmed by forced medication. Beyond that, there are... You're jumping a step ahead. Now you're not talking about him as currently a patient who may be a danger to others and, in your other case coming up from last week, to himself. You're talking about something having to do with his trial. If they're in conflict, haven't the cases been clear that there's a penological interest and a primary interest in the prison facility to maintain the stability and freedom from danger? Don't we start there with this person as an individual who may be harmed rather than getting the game plan such that we have to worry about what he's going to do when he gets into court? Well, I don't believe that that interest can be ignored at this stage, and I think the Supreme Court spoke to that in Selle when they said that there are a number of different rights involved. There's a right, of course, to not have been tried in a way that's prejudiced by the forced medication, but there's also a right, and Selle is very clear about this, that there's a right to avoid forced medication that might in the future negatively affect an individual's fair trial rights. You could take care of that, too, separately. I'm sorry, Your Honor. You could also take care of that interest separately. You could. You could, I mean, you could evaluate, you could put that as a separate prong of the standard. That's not the normal way under Mills v. Rogers that we deal with substantive due process questions. We normally consider all the interests at once and determine a single standard that will account for those varying interests. And my best reading of the cases is that's what's set forth in Riggins when they propose the standard that the medication must be essential to maintaining safety as well as being, considering less intrusive measures, as well as being medically appropriate, that that single standard is meant to take into account the varying interests on both sides, the prison's interest in safety and security and the individual's interest in bodily integrity, freedom from unwanted medication, and in a fair trial sometime in the future. Now, at some point, it may have to be addressed separately anyways, in the same context in which the Supreme Court sets out the consideration itself. But for the purposes, for where we are right now, we don't believe that's the case. Is it possible that doctors could determine that medication was both essential and that there were no alternatives and that you might still have an argument that it rendered your client incompetent to stand trial? That's perfectly possible. It's certainly possible that applying the correct standard as we see in this case. How are the doctors supposed to reach a medical decision about preserving the safe environment both for your client, for people who are dealing with him in the prison context, and at the same time supposed to account for interests that he may have in being able to aid in his defense at trial? Well, we don't think they are to do that directly. We believe that the Riggins standard requiring that the medication be essential, considering less intrusive means, takes into account that interest. So there's no need for either doctors or courts at this stage to examine the potential fair trial right. It doesn't take into account the interest. It overrides it. Well, it would override it if the standards are met. But the standard itself, the substantive due process standard laid out, as Harper says and as Mills versus Rogers said, is an accommodation between the competing interests, that once one formulates the standard to reach that correct balance. Maybe I misunderstood you then. I thought that you were arguing that the doctors had to account for how his medication might affect him in the future. No, a court may need to do that sometime in the future, but our argument is that the doctors and a court at this point in time must apply the Riggins standard and that that standard embodies that right. Let me step back a little bit and explain why I'm arguing this. As I understand Harper and its interpretations of Mills versus Rogers, what it says is that when we're trying to formulate a substantive due process standard, we want one that's easy for the decisionmaker to apply. And so what we do as courts is we take the competing interests on the private side and the competing governmental interests on the other side. We consider how those should be balanced and we determine a standard which will be relatively easy for the decisionmaker to apply. That's what they did in Harper. The balance of interests are different here and so you have a different standard, but ultimately that standard is the single standard in Riggins and the doctors and the district court at this point in time don't have to look directly, directly at the potential trial right. And of course in Sell, one of the reasons the Supreme Court says we'd like the courts, the district courts to first look at the issue of dangerousness and whether or not that justifies medication because that's a more manageable decision. And it's more manageable for a couple of reasons. One, we're only looking at mitigating danger and we only have to figure out will this medication mitigate danger or won't it mitigate danger. And two, we don't have to predict at this point in time the effect on fair trial rights. And the reason we don't have to predict is we struck the proper balance in the standard we formulated and the standard that we set out in Riggins. So there's no need now. Now, of course, you may get to the point in time where you are pending trial and the request is to cease medication or to bar trial because the only way to render the individual competent within the sort of PATE standard is, or the drug standard, is by giving them medication that has the same sort of effects that Justice Kennedy talked about in his concurrence in Riggins. So how does the Riggins standard differ from what was done here, the substantive due process as opposed to the procedural due process? Well, the substantive standard differs in requiring that the medication be essential considering less intrusive means. And I think that's carefully worded so it doesn't mean that it's the least intrusive means. It is not a least intrusive means test. And I think what it allows, it's something in between a rational basis standard and a least intrusive means test. And, of course, even Turner v. Safely, the case on which the government wants to rely in supporting its view of the standard, is something with a little bit more bite than normal rational basis standards. And here is that the three-doctor panel did what? Well, the three-doctor panel here considered less intrusive means, but they rejected them for illegitimate reasons. They rejected them not because they wouldn't mitigate danger. And, in fact, they specifically said these may mitigate danger, but they rejected them because they wouldn't treat the core underlying mental illness. I don't think that's fair. What they said was you have to treat the core underlying in order to protect him from this dangerous problem. In other words, they were saying, as medical professionals, that you can't do the peripheral stuff. You've got to get right to the problem in order to protect him. There wasn't anything that I saw in the record, maybe you can point to me and show me or I'm wrong, that they were doing anything other than trying to take care of the danger to others problem. Well, you know, I respectfully disagree. And if one looks at the findings, there are very specific findings that sedation or minor tranquilizers will reduce agitation and may affect danger, but they won't treat the core underlying mental illness. Restraints may be an effective measure for reducing danger, but they're temporary and won't treat the core underlying mental illness. One of the problems I am having is why, and I'm repeating what I said earlier, why this has to be plugged into a box as opposed to both substantively and procedurally taking into account the actual interest. So, for example, with regard to the substantive due process issue, without talking about a level of scrutiny language, why aren't we simply saying that in the pretrial context, long-term cures are not a legitimate governmental interest, and, in fact, there is an interest on the part of the defendant in not having a long-term cure if he doesn't want one because he's or somebody on his behalf doesn't want one, which, of course, is a problem here. The person isn't necessarily competent to decide that. And so looking directly at that instead of making a standard of scrutiny hierarchy out of it. Well, certainly that can be done. And in some sense, I mean, I think that conceptually, in some ways, that's most appealing, that you look directly at the interests, consider how they affect each other, and reach a balance. And then, essentially, there is no legitimate penological interest that's reasonably forwarded in the terms of the original Harper opinion. In the pretrial context, if it involves, if it depends on the importance of a long-term cure because that's not part of their business. And I'd agree with that. The reason that we've set forth our position as we have, there are two reasons, really. One is it has to do with our particular understanding of the Supreme Court's usual approach to this. Now, I say that bearing in mind that in cell, they abandoned that approach and looked specifically to the various interests at stake and asked the court to engage in those very difficult balancing tests among the particular interests. So that's one reason is that it's contrary to our normal understanding of the court's typical approaches. The other is it's just a more difficult standard for the decision maker to apply. And we are trying to follow on in the more usual approach, which allows the decision maker an easier standard to apply here. So we've tried to frame our argument in terms of what we understand to be the typical approach of the Supreme Court and what makes it most easy for the decision maker. But obviously, in light of cell, that's a valid approach as well. And we can't dispute that it would be a valid approach. Could you go back to cell just a moment? I don't quite understand your position. In cell, they do these processes. And then Justice Breyer seems to skip over to a court need not consider whether to allow forced medication for that kind of purpose if forced medication is warranted for a different purpose, such as the purpose set out in Harper. And it strikes me as rather strange that the court seems to be saying you don't have to go through all of this if you've got truly a Harper situation where the dangerousness issue comes up. What's your take on that wording? Well, our take on it is first the court doesn't simply say, and it's clear that they're not saying you should send this back to the Bureau of Prisons for an administrative determination. They're directing the district court to consider it. And the language is for the purposes set out in Harper, in other words, for dangerousness. And, of course, the standard they refer back to in discussing that many times is the Riggins standard. And so our view is that what the court in cell is saying is before you get into the cell process, which involves the direct balancing of interests and is necessarily harder, more complicated for the district court, first look at dangerousness. First look, is it essential in order to mitigate dangerousness? Is it medically appropriate? And if it is, you won't get there. But that's the circumstance that somebody is coming to the court and asking for an order, a cell order. But no one here went to the court and asked for a cell order. That's true, Your Honor. But we don't believe that that changes the legal posture in the sense that it doesn't change the legal standard that should be applied or who the decision-makers should be. Could you, before you finish, do two things. One is give us your sense of the procedural circumstances, given the fact that there's now been a separate emergency order and a separate hearing on the emergency order and so on. Are we still reviewing the original order and why are we doing that or should we be? I understand that the question of which procedures and standards apply seems plainly still an issue between the parties, but should we determine that and not try to actually look at this order? Well, I'm hesitant to address the order because I don't think there's record evidence and I don't want to step out of the record, but as you know, of course, on Friday there was a determination and an appeal was filed. And conceptually, the standards this court will determine are identical to either determination. Can we just take that appeal until next week and have another argument and do that one? You certainly could, and one of the reasons we wanted to get the notice filed quickly was so that if this court intended to address both issues at once, and as I said, we think they're conceptually identical, we wanted to give the court an opportunity to do so. So we don't think there's any difference in the standards. Well, they're identical conceptually, but the orders are different. It seems like the record is more developed from what I know in the second version. And in various ways, the issues are maybe better, the longer term interests are better both because that's the order that's in effect now and also because perhaps the order was a little better done, so we can assume it's a better order, but is it a valid one? Well, I haven't actually seen the order. It was emailed. The written order was emailed. No, I don't mean the district court's order. I mean the determinations made by the administrative. Well, you know, that's also confusing because, of course, if I can procedurally back up a little bit, what we have in the case of the prison action is that there was an emergency determination made to Medicaid back on July 18th. Normally, one would expect that an emergency would be a brief duration and would be followed by a prompt post-deprivation hearing as required under PEROT in those cases. In this case, the prison waited almost six weeks, and as we were walking in to make our arguments on Friday, we learned that they'd held a hearing the day before. We have questions about that hearing. I don't want to get into those because they're outside of the record. So that would seem to be the prompt post-deprivation hearing, but no one amongst us has seen the record as to that particular proceeding, and I just can't speak to it. All right. But one possible approach would be, from our point of view, would be there's another pending. But that pending appeal now is not from a Harper hearing as such. It's from an emergency. Well, with the denial of the motion that was pending before the Court on Friday, the motion for a prompt post-deprivation hearing, I think it does become a Harper hearing. I think that the district court ruled that the Harper hearing, Harper-type hearing provided on Thursday, was in fact the process due as a prompt post-deprivation hearing, and that the court would not allow more. So I really think the issue is emergency. Okay. Mr. Anderson, is that the appeal that you took as an appeal from that Thursday determination? It would be an appeal. Technically, it's an appeal of the district court's denial of a post-deprivation hearing under the standards we've set forth. Because there already was one, on the grounds that there already was one. Yes, yes. That was the court's grounds for denying the motion. I see that. Okay. As I said, I'll tell you when I. We'll let you know when we're paying attention. Okay. I don't want to overstay my welcome. No, no, no. That's fine. So here's. So I do want to talk about the procedure some then. Founding the same theme again. Why do we have to buy one version or another? Why couldn't we come up with a, say, an administrative procedure, but one in which there was some kind of lawyer involvement perhaps, some notice to the lawyers, some more robust ability to provide testimony by outside psychiatrists, but keeping it in the administrative process with an arbitrariness review, rather than dragging everybody out here before a judge who's not a lawyer, a doctor, for that purpose? Well, that could be done. I mean, Matthews v. Eldridge is very clear that the hallmark of due process is flexibility. But we'd urge the court not to do that, and the reason we'd urge the court not to do that is, one, we think it creates increased difficulties to create this sort of hybrid procedure. We've worked with Springfield, with Bureau of Prisons, and there are real difficulties in terms of just the logistics of the kind of procedure Your Honor is proposing. Beyond that, we have a strong belief that's set out in our briefs, that there needs to be an independent decision maker, and that independent decision maker really cannot be within the institution. And the reason is the dual obligations that the particular institution is saddled with. That's the obligation to restore competency under the statute, and the obligation to maintain the safety and security of the institution. In Washington v. Harper, you've got a situation where the interests of the doctors who are making the medical decision are perfectly aligned with the state's legitimate interests and the interests of the individual. Here that's not the case. Here they've got these dual obligations, but only one of which they may take into account in making a decision of whether to medicate for dangerousness. That's the danger to the institution or to himself. They cannot take into account their obligation to restore them to competency. And so that conflicted set of duties leads to a lack of independence and leads to a problem in, of course, the hallmark of proceeding to the independent decision maker. What do you have besides rhetoric that talks about a dual process that is an internal conflict, or as your brief so elegantly puts it, some sort of a permanent incapacity to carry this out? These are professional psychiatrists. They set up the rules such that no one working on the case does the review. Is there anything in the record that could show us that because these professional medical people work at one side of the hospital, another side of the hospital, that they can't oversee that? Is there anything in the record that we could base a finding that we have to substitute a court process rather than an administrative process, because from a factual point of view, they're incompetent to do so because of an internal bias? Well, we think both the procedures employed and the findings of the administrative proceeding demonstrate that incompetence. And let me say specifically, as Your Honor knows, there's the issue of whether or not Mr. Loeffner was allowed to call a witness who he had asked for. And the interpretation that his statement in response to a very direct and clear question of do you want any witnesses, yes, I want my lawyer, a lawyer who was a witness to one of the incidents which they relied upon. Well, the findings have already been made by the court that they weren't talking about a witness but a lawyer present. And you have to find that finding clearly erroneous before that argument is going to have a basis, aren't you? I think it's clearly erroneous on the record. If the court heard no testimony, the court was relying on the paper record which is before this court. Did the court make a de novo factual determination or did they essentially defer to the re-for arbitration? It accepted an explanation offered by the U.S. attorney for this. The hearing officer himself never makes any finding, never offers any finding. The court heard no testimony. I'm not sure if it referred to itself as making a finding or not, but it's not a finding in any normal sense. But more generally, I mean, looking, at least my looking at the record, suggestions and looking at the other cases as well, I mean, just reading through the case law on this, I had two observations. One is that this particular facility, in fact, this particular psychiatrist who was making the decision here, has determined that people are not dangerous on occasion. But the second is that the so-called staff representative doesn't seem to do anything. No. And I think both of those are true from what I know. If I could step back to one other factor that I think also addresses Judge Wallace's question, and that's that the findings themselves, I think, demonstrate the conflict that we're speaking about. As we've argued many times, each of the findings, rejecting less intrusive means, do so not because they won't mitigate danger, which is the proper purpose that the doctors are allowed to look to in determining whether to medicate, but because they won't treat underlying mental illness. And we think that those findings, the nature of those findings, demonstrates the conflicted motives and the incapacity of these individuals to act as independent decision makers in this case. It is really a disability of almost all doctors. I mean, not because of their institutional situation, but because doctors think that you should treat people. I certainly see your point, Your Honor, and I think that in these circumstances where there's only – and that's why they're good decision makers in the situation of a convicted individual like Harper, where the states obtain the right to treat, because their biases line up with the state's legitimate purposes. Here, we've really got a situation where there's almost necessarily, even aside from the institutional bias, that professional bias that Your Honor's just pointed to, which is it's an obligation of their profession to try and treat at the deepest level, and in fact they're not allowed to do so here unless very particular standards are met. And so for that reason, we would agree that there is almost an institutional bias, which requires a judge or some other outside decision maker to step in and act here. Would you say that that would be satisfied – assuming it's correct – would you say it would be satisfied in an administrative hearing where a psychiatrist not from Springfield did the review? It could be. It certainly could be, Your Honor. I haven't thought that question through fully enough to give you a really good answer to the question. There are various possibilities. That's one. Having some kind of lawyer involvement is another. Having notice to the lawyers at a minimum is another. I mean, there are various things one could do, recognizing the somewhat different interests that you're talking about, without creating a full-blown judicial hearing. And the question is, why not try to do that in an imaginative fashion rather than trying to – I mean, this case sort of illustrates why, it seems to me, why having it done judicially has problems, namely that everything keeps changing all the time. Well, Your Honor, let me give you an example of something that occurred the other day that will show just how – why this doesn't need to be a difficult and burdensome process. The other day we were discussing a different issue, one not before this Court at all, in which the input of the psychiatrist at Springfield was considered helpful. And with the prosecution in Tucson and the defense in San Diego and the psychiatrist in Springfield, we were able to take testimony on that issue, and the judge was able to reach a determination. So I think in this day of technology, it's really not necessary for a judicial proceeding to become overly burdensome. Of course, in this case, we've pointed out that the time from the particular incidents that Springfield thought gave rise to danger until the time they bothered to convene a hearing was more than two months. And in light of the speed with which all the participants have acted in this case, including the judge, including the lawyers, I certainly think that a judicial proceeding could have considered the matter and made an appropriate determination well before that two months had expired. Counsel, I've listened to your argument. I've read the brief carefully. And I have to say that at this stage, having spent the last couple of weeks working on this, that I don't really understand what it is that you want. I've heard very, very lofty and very, very broad generalizations about Harper v. Sells and Riggins. But it would be really helpful for me if you would say, this is what we think the Due Process Clause requires at a minimum, this is what we want you to do. We want a judicial adversary hearing with representation by lawyers and a clear and convincing evidence standard. We want the substantive standard to be that of Riggins, that medication must be medically appropriate and considering less intrusive means essential to the safety of the individual or others in the institution. Okay. And in the judicial adversarial hearing, this is one in which you would be, we would allow psychiatrists to testify from both sides as to how they thought he ought to be medicated, and then we're going to have a doctor, and then we're going to have the judge decide what medication he can have and in what dosages? Well, the judge would be deciding, first, the question of dangerousness. Has there been a demonstration that the individual is dangerous? Is the proposed course of medication medically appropriate? And that's something that this Court has talked about in, I believe it's in Hernandez-Vasquez, where the Court says that it's necessary for a court in the sell context to consider the particular medication and the particular dose or range of doses before a judgment about medical appropriateness can be made. We don't think it would be necessary for the court to specify some particular course of medication or even a single medication or a single dose, but rather to consider whether the proposed course is medically appropriate. And then, of course, to consider the evidence about the alternatives and whether or not they will, in fact, alleviate the danger if the court has found that danger,  I think your statement is very interesting, how quickly we're able to do this in a court situation, but my experience has been a little different. By the time you get experts on both sides and have discovery and depositions and then you get a ruling from a judge after the judge goes through all of that, somebody usually wants to come see us, and the appellate process is not considered the fastest game in town. It seems to me it's rather long. Wouldn't something more administrative that can check on the dangerousness be sufficient without all of the bells and whistles of an adversary proceeding? Without, well, I think it's necessary that there be an adversary proceeding so that different points of view can be put before the decision maker. One of the problems here, as you see from a review of the record of the proceeding that occurred, is that there was no different point of view. The staff representative sat there and offered nothing on Mr. Loughner's behalf when the question was called. No information beyond that by the treating psychologist and psychiatrist was put forward. He just didn't represent you at all. And I think that's almost a necessary failure of an administrative proceeding. It's very difficult if lawyers aren't involved who are willing to advocate for the interests of the party that there's going to be any full presentation of issues. Once you get the lawyers involved, then you almost have to have a judicial administrator, don't you? You almost have to have a judicial hearing because you can't appear before a three-doctor panel with the lawyers jumping in and making objections. It's certainly more what we're used to, and, of course, we all speak the same language. One of the problems is that, in some ways, there are legal standards involved here, and doctors simply don't speak the language of legal standards, and so they misapply those standards. Going back to your question that Judge Wallace asked you, if we go to a judicially adversarial hearing, would you have discovery? You know, I believe there should be very quick discovery. I mean, I think the discovery on the whole... We're talking depositions? No, no, no. Interrogatories? I think it should be up to the district court judge to make decisions about that, whether it's necessary in a particular case, but certainly in this case where there's been disclosure of progress notes, disclosure of regular reports, it seems to me that we would have been prepared to go very, very quickly into a hearing without anything like depositions or interrogatories. Remember, we're criminal lawyers. We're not used to these sort of procedures anyway. You're very good lawyers, but, you know, we don't have all very good lawyers that may get these cases. The thing that strikes me is... I can see your point if we're talking about we're going to medicate him during trial or not. That's a very serious problem that is one of them that a judge would make a decision on. What we're talking about now is taking care of prisoners who have no one else but behind bars and they're dangerous, assuming they're dangerous. If they are, you need to medicate them quickly. You need to take care of them. It's all well and good to have these theories, but if you're the one that walks in and they've hung themselves the night before, then you've got a case that really is a difficult one. So what concerns me is not your case. You're excellent lawyers. What concerns me, if we set up something that would give all of the trappings of a usual civil case, in the meantime, there's somebody in jail somewhere that may need something that is going without. That's the real concern I have about the case. Maybe you can help me with that. Well, it has never been our position that anything bars the Bureau of Prisons from acting in an emergency, acting appropriately. It's absolutely clear under the Due Process Clause that faced with an overwhelming need, with an emergency, the government can act and provide the necessary process later. If he's dangerous to himself or to others. Or to others. And we don't propose anything different. And the states constantly use these sorts of procedures. You know, we think of them as the 72-hour orders, the 72-hour holds, where they act to, on an emergency basis, commit and medicate an individual and then bring it to a court three days later to consider whether or not the decision was appropriate and whether medication and commitment should be ongoing. The states manage this every day without a problem. We don't think it would be any greater problem here. We should wrap this up in the next two minutes. Yes, I would prefer to have a final answer to the question of how we proceed in light Is there any point in our reviewing the order that brought you here in this case or should we essentially forget it since it's not an operative order? I mean, I understand that it could. It wouldn't even be an operative order with the emergency to participate. It would have to be another order, right? Yes. So this order is just not an operative order, although the problem is an ongoing problem. Is that basically right? That's correct. Your Honor, the reason we think you should go ahead and decide this matter is because your decision here will effectively govern what's happening. Well, yes, but that doesn't mean that we ought to review the details of this order as to whether there was medication proper and whether they should have had the witness and whether the reasons given were proper and all that. It doesn't make much sense. I see your point, Your Honor. In that sense, I hate to tee something up for another argument and another set of briefing and another trip up here, but certainly the procedural due process issues in the sense of those that are confined to the particular hearing are the ones that occurred in the first hearing and are no longer relevant except to the extent that they form this Court's judgment of the adequacy of the administrative proceeding. Now the Court will be focused on the proceeding that actually took place on Thursday and the way in which those procedures were observed. So, but I think this case, as the government's conceded, clearly is in mood, and a judgment by the Court in this case will guide the Court below. It's not mood as to some things, but it seems to be mood as to others, i.e., the particular order. I would agree, Your Honor. Okay. I would agree with that. Thank you very much. Thank you, Your Honor. Thank you for a helpful argument. We've now left the Court. Okay. So, since he took nearly 40 minutes, you may just have to... But I'll stop you at 40 and give him a couple minutes to work on it. Okay. And you don't need to talk for 40 minutes. Good afternoon, Your Honor. Chris Cabanillas on behalf of the District of Arizona. I'd like to address that last consideration first. You've asked about mootness. When it comes down to it, you're absolutely right. With the 6th, June 14th determination that he was a danger to others, if this Court were to say that that was procedurally faulty for some reason, it has no practical effect on BOP's ability to medicate the defendant because he's now being medicated as a danger to himself. I wanted to just clarify something quickly about the record. July 18th was when the emergency decision came down. And then last Thursday, BOP gave him a Harper hearing, also finding that he's a danger to himself. So there are two prior, I guess I'm sorry, two subsequent determinations by BOP here, not just one. The defendant has challenged the emergency decision down in district court. And the district court denied that on Friday. And he has now filed a notice of appeal off that decision. You mean, excuse me, the emergency of being a danger to himself. Yes. That was a decision made on July 18th. And the defendant now, he filed a district court challenge to that. And Judge Burns denied that on Friday. And so the notice of appeal concerns that denial. I understand that. But my understanding from what he said was that it was denied on the ground of the other hearing having taken place. Yeah, I think actually that the court denied it because the same argument was made that you need to have a judicial hearing. And Judge Burns said, no, you don't, for the same reasons that he recognized that you don't have to have it for the prior Harper determination. So that was the grounds for the denial. So that issue is certainly a live issue between the parties, for sure, as is the general overall substantive issue. I'm sorry, say that again. So that issue, I mean, the basic questions of what are the substance and procedure applicable here is certainly a live issue between the parties. Whether there should be a judicial hearing. And what the standards are, substantive standards. Yeah, I actually wanted to add something to the point about, you know, there's the question about whether there's the remediability under Article III. And there is no remedy practically to be applied if this court was to invalidate the June 14th determination. But a couple of other things may militate in favor of this court deciding this. One is if the court does affirm the BOP decision that he's a danger to others, you know, that would act as an additional ground of medicated. Certainly not indispensable, of course, because they are now medicated. But that's not even an operative ground anymore, is it? Well, it has been stayed by this court. I see. That decision is kind of, you know what I mean? We told you you could use tranquilizers, but you can't use anything else. I don't know upon what record there were doctors that made that determination that tranquilizer was as good as the other medication. But you've been restricted to use only tranquilizers, I understand, on the danger to others. Let me ask, you talked about the June 14th hearing. Counsel was talking about this very long period of time it took to make the decision at the BOP level. As I recall, the June 14th hearing was immediately appealed up the administrative ladder, and it took six days to get to the final person. And then one day later, the medication was specifically prescribed, and it was to last for 30 days. Now, we don't have anything in the record. Apparently, it took one week from the hearing until the time the actual prescription was made, and then it was for 30 days, but we don't have anything in the record that shows what happens after 30 days. That is, the medication was specific and the time was specific. Well, Your Honor, again, the order was stayed. That decision to medicate was stayed by the court. Within the 30 days? Yes. Okay. Does that as a matter of regulation run out after 30 days? Yes. If you look at, let me just answer that more specifically. If you look at, the regulation is attached as Appendix B to the defendant's opening brief, and if you look at the regulation, subsection little a, that's the one that deals with the Harper procedures, that's what we're talking about today. There's little 8, A8, and it talks about a psychiatrist shall provide follow-up monitoring of the patient's treatment at least once every 30 days. So that's where that comes from. Okay. So there's monitoring that occurs there. Every 30-day monitoring. I'm sorry? Every 30-day monitoring. But it doesn't mean that there's another hearing in 30 days? No, not necessarily. Okay. So is there some way that the parties could perhaps get together and come up with a way to tee up what you think is the actual issue on an actual order that we ought to be deciding? At least think about that after this hearing, because I think everybody wants an answer to the questions, to the basic questions. On the other hand, there doesn't seem to be a lot of utility in our reviewing orders that are never going to be implemented. So it would be nice to get up here with the orders that are being implemented and have a decision to be made on something that actually exists. I do want to mention something, though, Your Honor, that the issue will recur as recognized and that capable of repetition is, and yet evading review is also. That's what I'm trying to be clear about. What's capable of repetition and evading review is the basic question of what procedures are available and what standard applies. But we don't usually decide things in the sky without an actual order in front of us. So we can use this order, even though it's perfectly possible it will never pop back in. Or we can wait until there is a, which could be next week as I understand it, there is an appeal in this court of an actual Harper hearing when it's already occurred with an order, and we could proceed quickly at that point and either have another argument or not have another argument, but not be spinning our wheels on an order that has absolutely no particular likelihood of coming back in. And what I'm suggesting is maybe the parties could get together and come up with a way to do that since everybody has an interest in having us decide the basic issues. Well, I guess, again, it depends. And I guess this gets down to the basic court issue. And I think Judge Feibe and Judge Wallace also recognize this. Medication decisions are happening quite often. I mean, there's decisions about what medication, whether to up it, whether to, you know. And so that's why it is particularly not well suited for the kind of judicial review that the defendant is asking this court to bless. And you want us to say that. So you want us to make a decision. Well, I guess I would submit it up to this court, of course, whether to review it. But let's presume for the sake of argument the court does. What I'd like to just specify again, and maybe get back to some of the questions the court asked Mr. Kahn, what we have here is medication based on dangerousness in a prison setting. That is separate from cells and the requirements of cells that deal with medication to restore competency. They are separate and distinct, and even cell recognizes that. The argument, as I understand it, is that they are separate and distinct as purposes, but that medicating him now on dangerousness grounds is going to have a possible impact on his ultimate, on the interests that are involved in a cell hearing. You mean the right to a fair trial and communication? Yes, right. You know, actually, cell answered that question, Your Honor. Cell said, and I quote, 123 Supreme Court at 2187, whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial development, or diminish the ability to express emotions, are matters important to determining the permissibility of medication to restore competency, but not necessarily relevant when dangerousness is primarily at issue. So the Supreme Court in cell is recognizing two distinct worlds here. But it actually said, the way you just read it, it was not necessarily. I guess the point that I would make here is that if you read cell, and I know this Court has, and I don't mean to suggest that you haven't. All I'm saying is if you read Briggins, cell, and Harper, what's being said there is Harper's difference when there's a prison security question, and that's what we have here. And the interests of the prison are the same whether or not you have a person in custody, pre-trial, or post-trial. What about the observation, which I find interesting, that there is also, not only are there trial interests, but there are, and I know this was largely the subject of the motions trial, motions panel hearing, the fact that it's pre-trial does mean that the liberty interests and the government's interests are somewhat different because the government has no long-term treatment and correction interest in this instance. And so, therefore, the standard, it would seem, has to be varied to take account of that, not necessarily in hierarchical terms, but as to what interests are recognized as legitimate. Your Honor, I would submit that the interests of the prison remains the same, and I think we've put authority to that regard in our brief. When it comes to the pre-trial context, it seems the court does look at whether or not the action at issue constitutes punishment. This court may recall, and Judge Berzin, I think you were on this panel, the Demory case, and the Demory case was a case where this court found the Maricopa County Sheriff could not use closed-circuit TV and record the inmates in a pre-trial setting as deterrents because it was more like punishment. Well, punishment is one point, but isn't it also true that the legitimate interests of the government and the legitimate liberty interests of the petitioner vary with regard to long-term impact and long-term correction and treatment? That is, it's one thing to say, well, if somebody is committed to the Bureau of Prisons after conviction, there is a governmental interest in making them better people because that's what they're there for, as opposed to if they're there on a pre-trial basis. I think actually the answer to that is found in Demory, in Bell, and in Bull. If you take a look at Demory again, the court distinguished the situation in that case from one where there was an interest in the prison to maintain security and order of the facility, noting that this court, the Ninth Circuit, has given, quote, wide latitude to prison officials when administering pre-trial detention facilities and in promoting prison safety. And that's at 378 F. 30, 1031 to 32. And in Bell, for example, the defendant here relies on the whole notion of presumption of innocence and some of the considerations that Your Honor just articulated. But Bell, the Supreme Court case, says the presumption of innocence provides no support for a compelling necessity rule. Kagan. We really have read the case. I'm reading them to us. I'm sorry. I wanted to mention, forgive me, Your Honor, I wanted to mention that while the presumption of innocence has great importance in the trial context, it has no application to a determination of the rights of a pre-trial detainee during confinement before his trial has even begun. I wasn't asking about a presumption of innocence. I was asking about the long-term, the interest in long-term correction and treatment, which, or at least the lack of an interest by the petitioner in not having correction and treatment in the post-conviction circumstance. And the fact that pre-trial, there is, it seems to me, more than an interest in avoiding punishment, there's an interest in avoiding other interferences with the person that have purposes other than keeping him detained. I think, Your Honor, the response would be that the purpose of the medication here was to evade the defendant's danger. Like, they weren't medicating him for, I think, Your Honor's words, their long-term cures. They were medicating to evade his danger so that the BOP personnel who have to draw blood and work around him have the ability to do so in a manner where his danger is reduced. And also the interest of the prison, again, was articulated in Harper, where it talks about how, you know, the interest is so great in a prison environment which has basically within it people who are, have a history of violent conduct. And, of course, this defendant, they knew what he was charged with. So what we have is a situation where Harper sets forth the prison's interest. And the question is, should this rule be different for a pretrial detainee? And the answer is no. Administrative protections here, and Judge Wallace, you asked about the constitutionality of CFR. The Fourth Circuit in Morgan found that this particular CFR complied with Harper. Indeed, it was enacted or created in the wake of it. So the question there became, and as the district court properly noted following Morgan, was the Bureau of Prisons' decision arbitrary? The thing about pretrial equaling post-trial is also enhanced, or that conclusion is enhanced, by the fact that we have the statute, 18 U.S.C. section 4042, which talks about how BOP is statutorily obligated and their obligation with regard to subsistence and care is the same, whether it's pretrial or post-trial. And the regulation at issue here actually defines inmate as, quote, and I'm looking at 28 CFR 549.40. It's right at the very beginning of the applicable reg here. Subsection little b, that this subpart applies to inmates in BOP custody as defined in part 500. And if you look at part 500, it says that inmates mean all persons in the custody of BOP or contract facilities, including persons charged with or convicted of offenses against the United States and persons held as detainees or otherwise. So the Bureau of Prisons regulation provides this ambit where it applies both whether it's pretrial or post-trial. We've got the statutes that say that. We have the cases that say that. What statute? I'm sorry. I'm sorry. This was the regulation. I know. The statute I was talking about was 18 U.S.C. 4042A, which is cited in our brief. And it basically just, this whole point is basically that the prison doesn't make this distinction. An inmate is an inmate, whether it's pretrial or post-trial, when it comes to the prison's interest in maintaining safety. I really have a hard time. For example, the order here says, Seclusion and restraints are mere temporary protective measures with no direct effect on mental disease. But what's wrong with a temporary protective measure if it protects against the danger as it pertains to a pretrial detainee? Why is it rational to go beyond that when you don't have any interest in, quote, fixing the guy, but just in making him not dangerous? Well, they do have an interest in treating that mental illness through the danger. And that's what Harper said. Harper says you do not have to just rely on restraints and such like that. As a matter of fact, I understand that, but it was in the context of somebody who has no countervailing interest in not being, quote, treated. I mean, he has some interest in not being treated with drugs, but no interest in not being essentially corrected or made a better person. Is Your Honor's question, then, related to the notion that there may be long-term side effects? Is that? No, not really. It's more that there may be long-term good effects, but he doesn't want them, and he's in pretrial detention. Well, I think, again, Harper balanced the interest at issue, and even if you applied them in a pretrial context, the interest would balance out the same. Again, the only distinction that this Court has made when you're looking at pretrial detainees was, you know, was this for a punishment purpose? And the answer there was not just a question. But it's certainly not true that the government can do anything that's not punishment with regard to a pretrial detainee. They can do anything that's not punishment and rationally forwards a legitimate interest that they have with regard to pretrial detainees, right? Well, Harper resolved that debate. No, it didn't, because it wasn't really with pretrial detainees. It didn't involve pretrial detainees, but in terms of the balance of interest at issue, there isn't a whole lot of difference here. Other than the fact that this person is pretrial. Well, I'm trying to suggest a difference, which I haven't been willing to engage with. Oh, I'm sorry, Your Honor. Can you repeat that again, then? Yes. There is an interest of a pretrial detainee, a liberty interest, it seems to me, in not wanting to be treated, bettered, corrected, or in any way effective for the good or bad, while he is being detained for the purpose of making sure he shows up for trial. The liberty interest in an inmate avoiding unwanted medication is outweighed by the prison's legitimate interest in medicating a dangerous, mentally ill inmate if it's in his medical interest. And that's exactly what the Bureau of Prisons found on June 14th. He's a danger to us. But isn't there a difference between the prison's interest in securing the long-term safety of its inmates, where it knows it's going to have somebody for 30 years to life, versus somebody who's sitting on a speedy trial right and is going to go to trial within a couple of weeks? No, the interest is the same for the prison. It's the same from this day to tomorrow, for today and tomorrow. But the pretrial detainee, if he were not in detention, would have the right of telling his doctor, no, I don't want that. And he's in prison, and as a pretrial detainee, he's only there temporarily. And depending on how the trial comes out, he may not be there at all. I think what Judge Furzon is asking is, isn't there a difference in the interest between a pretrial detainee who is only going to be temporarily in the facility and one who's going to be there for 30 years to life? If there is that distinction to be drawn here, Your Honor, I'd submit to you that the prison's interest overrides that. If there's a distinction that the Court finds legally significant between a pretrial person who's in custody and an inmate who's in custody who's been convicted, we would submit that the prison's interest in abating the danger of a dangerous inmate and allowing their own people to work around him overrides that interest. And also, as the district court said, a dangerous person is dangerous, whether he's pretrial or after. You know, so that's the interest that's truly at issue here. And, again, Bell said that the fact of confinement, even though it limits retained constitutional rights, and the principle quote applies equally to pretrial detainees and convicted prisoners. So, again, we submit that that's been answered. But the issue is one that's very critical, is to the defendant's best interest never to get healed, because he would have to face a capital case, and it's a very difficult capital case to face. So it might be better for him to be a little dangerous, as far as her is concerned, and be locked into solitary confinement so that he won't be well. I think that's the issue. Is there a way of taking those interests into consideration? What's best for him as far as danger? What's best for him as far as his long-term longevity is concerned? Or should the prison even be involved in that sort of balancing? Again, I would submit that Harper balanced what happens when you have a person who wants to not have meds. But you have the fact that he's in custody, and the prison has a dangerous person, and they need to deal with that. And, of course, the BOP in this context, by the way, has been required by the district court to assess him. They haven't determined yet whether or not he can be restored to competency. They're just trying to assess him, but they need to be able to do that safely. And grasping on to Harper, administrative requirements. You know, the Supreme Court said doctors are in the best situation to make these calls in a prison safety setting. And that remains the same, even in this case. And so if you have doctors being able to make this decision, and judges, they actually said not only adequate but better to preserve his due process. I think this Court has already recognized, you know, the difficulties of having judges do this. Oh, we're experts now. We read the record. In fact, in the post-conviction context, it seems that there are no other considerations. And there are no concerns about the impact, ultimate impact on fair trial rights. And there are no concerns about the impact of the kind of thing I'm talking about. This is a little different than what Judge Wallace said, although that may be part of it. But it's not so much an interest in not getting better for legal reasons, but just an interest in essentially being let alone when you have no right to bother me because I'm a pretrial person. I'm not, in fact, under your jurisdiction to be improved upon. And given those two differences, why it seems to me more appropriate to say that there is not maybe a federal or, you know, foundational difference, but there are differences in the pertinent interests which are more legal life in this context. I would submit to you, again, that the answer is there's no distinction when it comes to what the BOP needs to do and the fact that a judge needs to offer it. Well, I want to pass a sentence just as being representative. Seclusion and restraints are mere temporary protective measures with no direct effect on mental disease. Now, why in the pretrial context is that a rational sentence? Why don't you say, well, fine, I'm not going to have any direct effect on mental disease, but if seclusion and restraints are going to do the job temporarily, that has to be enough. Because that's not enough to evade the danger. It doesn't say that. It doesn't say that. It says to, if you look at the whole, I know this Court has the entire decision. I do have the entire decision. No, no, I'm talking for myself. I'm sorry, Your Honor. Let me just see if I can find this one page that I want to look for. At SCR 30, when they talk about the decision, it's in his best medical interest. As a result of a mental disease or defect, he is a danger. So it's the mental disease that they're finding is at the root of the dangerousness, and that's what allows them to treat him to Harper. And Harper permits doctors not just to use temporary measures if it won't abate the dangerousness. And that's what you're finding here. Again, it's an administrative decision. And you think it would be okay in Harper to say, well, look, in the Harper context, sure, it might abate the dangerousness in the short run, but it's really, this guy's going to be around for 30 years. And not only that, part of our job is to make him a better guy, not just to abate his dangerousness. So he has no interest in not being made a better guy. And why should we have to go through all the seclusion, restraints and difficulty of that if we can fix him up with mental medication in the Harper context? And that would be a rational decision. Because I think this court would have to sidestep Harper in a way that I don't think it can. I think Harper has resolved that when you're in custody of a prison, that the prison officials have the ability to abate the danger of a mentally ill person. Remember, Harper only applies if you have a mental defect or mental illness. It's not just anybody who's dangerous. There is a specific type of violent person that Harper is directed at. And that's what we have here. And one of the things that defense counsel argued I wanted to address as well is this whole notion of bias on the part of BOP. The district court rejected that out of hand, and we would submit that that determination is not clearly erroneous. I mean, these doctors have the ethical duty to treat the folks in the way that they believe the individual should be treated in his medical interest under Harper. And there's been no showing of that. Defense counsel makes, I think, a good point that there was no facts upon which to make a factual finding. So I'm not sure we can give a clearly erroneous review. I think he was talking about the witness issue. I'm talking about the BOP issue, about whether or not they're biased. The court actually did make a factual finding on that. With regard to the witness question, though, the court was basically just coming to the conclusion that BOP's decision that when he said, I want an attorney, it was for legal representation and not to be a witness in the tradition of a witness. I'd also add that the- I mean, why isn't that somewhat representative of some kind of a bias? I mean, ordinarily, if somebody said that, you'd say to him, what do you want? You want him to be a witness or you want him to be a lawyer? And instead of asking him, they just plunged ahead. I think it's because Harper answered that question, Your Honor, that when somebody asks for an attorney, excuse me, that an attorney is not required under Harper, that a staff representative is sufficient. So Harper addresses that we don't have lawyers involved in this particular administrative decision. And so when Mr. Getchell heard the defendant say that, he also was informed by the fact that on June 2nd, he had advised the defendant, do you want witnesses? He says no. On June 13th, he says, do you want witnesses? He says no. And he says the hearing violates his constitutional rights. I'm sorry? You think the representative represented him? I'm sorry, did what? You think the representative represented him? Sure. He advised him of his right, his notice, you know, gave him notice, gave him, you know, what- That's not usually what a representative does. What a representative usually does is follow his interests. I would say that the district court properly found that that part of the requirement was following regulation. And we would concur with that. By simply saying absolutely nothing on his behalf, like he shouldn't be medicated? By saying nothing like that? Well, Your Honor, I would submit that the evidence that they were presented with demonstrated that he should be medicated, that there was a basis to show that he was a danger to others. So in other words, he doesn't have a representative because the representative is looking after the institution's interests and not his. The staff representative was there as part of the regulation. And remember in the Fourth Circuit decision in Morgan, one of the things they found there was that this correctional officer was not a staff representative. Here we don't have that problem. He was a staff representative. They vacated and remanded to find out credentials? Because in that case it was whether or not he was- and here we don't have that problem. There's never been an allegation. I understand. I'm just clarifying. In Morgan, they were looking at the regulation to determine whether or not it was constitutional. Correct? They looked at whether it provided Harper procedures, yes, due process. Do we have some cases that say that when another circuit speaks that we follow the circuit, unless we have a good reason not to, sort of a unity approach? We would discourage this Court from creating a circuit split. We have several cases on that. Wait until the question mark comes, please. I suggested to counsel that perhaps the narrow issue we should be deciding is whether or not that regulation is constitutional as far as this hearing is concerned and that that narrow issue would be sufficient, I guess, based upon Morgan and Bell, which I assume would be-Bell would be the best case to make that determination. What's your position on that? Do we have more to decide or can we decide a more narrow issue at this go-around as to the constitutionality of the regulation? I think that we would encourage this Court, if it goes there, to follow Harper. Harper found that- No, no, no. That's not the question. The question is, should we go any further than determination of whether or not that regulation meets constitutional standards? I don't think so. As long as the Court finds that it complies with Harper procedures and the Fourth Circuit found that, then the only question is whether it was arbitrary, this decision. So it is a very narrow inquiry. The Morgan case was before a sale, right? I'm sorry? The Morgan case was before a sale. Yes. So it didn't take sale into account. In this Harper scenario, you could have a circuit conflict. But it was a case that didn't have all the data we have now. May I have just a moment, Your Honor? It predated sale, but again, sale itself says-we look at Harper before we look at sale. They're different things. So the defendant's effort to sort of graft a sale requirement onto Harper, that should be rejected because that has been rejected. Many cases have found that it is up to the prison to medicate for dangerousness in a prison setting, and it is up to a court to deal with the medication, a judicial question of whether to medicate for competency, which is wholly separate and distinct. And we would ask this Court not to sort of graft these requirements, blend these requirements. We think the Supreme Court in Harper adequately accounted for the interest at issue. The pretrial context does not change the fact that the prison's legitimate interest in medicating an inmate who is dangerous remains the same and trumps the inmate's right to decline medication. And that is the heart of this. Could I ask you a question that's been bothering me some time? I want to make sure I get it asked. We have had a case where we wouldn't let a person go out on probation or parole or medicated, and we didn't give how much and how long, or the court didn't. We reversed that. Are you talking about Williams? Yes. I know the case. You don't have to tell me about it. In the case to which we've been referring, Bell v. Sell, I mean, where Justice Breyer points out, as you say, that there's a different situation if you have dangerousness. But he also says, the medical experts may find it easier to provide an informed opinion about whether, given the risk of side effects, particular drugs are medically appropriate and necessary to control the patient's behavior. Now, from that, you could extrapolate an argument that the Bureau of Prisons, in using this can't just say, given this drug, because it's necessary to control dangers to others, but it must be given this drug, meaning this number of milligrams per day for this length of time, and then it has to be rechecked. Is that required under a proper interpretation of the regulation in order to meet constitutional guarantees after Williams? Williams, Your Honor, the reason I said, do you mean Williams, is because it's actually not cited in the brief. I just am aware of it. So Williams dealt with medication as a condition of supervised release. That's a judicial determination. Again, when you're making judicial determinations about when a medication is appropriate, that's a different context. It was not medication for dangerousness. It was medication for dangerousness. Wasn't it for dangerousness because they wanted him medicated before he went out, before he could have supervised release? As I recall, Williams, and it's one of the cases I didn't bring up, I'm sorry, but as I recall, it was a question about whether or not you could have medication as a condition of supervised release. Why were you giving him the medication? You had to designate how much, how long, et cetera. But again, that, again, yes, I would say that when you're talking about medication in a prison setting, like this case and like Harper, that Harper controls that. And when, in Williams, they were assessing, as I recall, the court assessing this, there's a question in that case, again, when you have a judge who's making the decision, and when you have a condition of supervised release, it is a judicial decision. It is now a judge decision. I submit that Williams is not controlling on that situation. You, you? If it were controlling. That's the point I eventually want to get to. If it were controlling, is it complied with by the clinical administrative note, providing the drugs for two times a day for 30 days, as in page 22 of the excerpt? June 20, the June 21st prescription, Your Honor? Yeah. Yes. That, I mean, our argument is that the specific dose doesn't have to be part of Harper. It's not part of Harper, but there was dosage provided here. So the defendant did get a prescription before he was medicated? Before he was medicated. Now, do I understand that what you do, I'm just trying to find out, what you do is you, they make a decision he's going to be medicated, then he can appeal that decision, which he did. Administratively? Administratively. Yes. But you wait until the end of the day before you give the actual prescription, is that correct? It sounds like that's what happened here, that the 24-hour. There was seven days. I think, well, the appeal is for 20, they have 24 hours to do it, 24 hours to make a decision. Let me just down shift here. It took, it took six days to get up and back down again. The hearing was on the 14th, and on the 21st, this medication was prescribed. Right. So that was seven days. It took six days to get up and get back down. And is this medication that was prescribed part of that process? Yes, because you have a prescription that is done before the defendant's medicated. And the appeal decision in this case at SCR 24 occurred on the 20th of June. So after having had his due process hearing, it also seems like. Wait a minute, don't go any further. Oh. So he went on the 20th. On the 20th, they denied his appeal. 21st, he gets a prescription. Can he now appeal the prescription and say, no, I want to be checked every seven days instead of every 30 days? Gosh, I don't know the answer to that, Your Honor. I'm sorry. Counsel, I have a question about judicial review of the Harper orders. What's the government's position with respect to whether or not a detainee can appeal a Harper order? Here? Yes. Okay. Or to the district court. And what is the mechanism for doing that? We agreed following Morgan that it was appropriate for Judge Burns to resolve this. Because in Morgan, there was an FMC Springfield determination that he should be medicated. And it went to the judge who's in the criminal court on that case. It seemed reasonable for Judge Burns to be the reviewing judge. And what's the mechanism for appealing it? It was under a preliminary injunction request, so it's under the all-writs provisions. Which one are you talking about, Your Honor? Well, the one that's at issue here, the June 14th, although I want to ask about any other hearing that results in some kind of a medical order for Mr. Loeffner. I'd like to know, what is the mechanism by which you get it into court? That may also determine what substantive standard we have to use as we review the order. And again, I guess I would say that the government took the position that it was appropriate in this context for That's a question. First of all, we're not asking you what you agreed to. We're asking you what's legally correct. Well, I guess I would raise that there's two possibilities. Okay. One was the Morgan way. The other is the APA way, theoretically, that Judge Scalia mentioned. Justice Scalia mentioned it's his dissent, and so. And under the APA, then, you, the government, would be willing to take the position that the BOP's decision is a final order under the APA, and therefore appealable, and that applies Section 706, the Arbitrary and Capricious Review. Is that correct? Do you want to take the position that after any hearing held before BOP, that that's a final agency order for purposes of APA review? Your Honor, I may file a letter on this just to address this more specifically. Okay. But I would submit to you that we did say that the administrative had been exhausted by the fact that he appealed to the law. Well, exhaustion wasn't exactly the question. The question was what mechanism allows Mr. Loeffner to seek judicial review? Because, again, that may determine, that scheme may help determine what standards we apply to our review of the administrator's decision. Just by way of warning, you have one minute left. Okay. And with Morgan, I'm sorry, I understand Morgan's the case, but that doesn't always determine our jurisdiction. So what is the standard of review after Morgan? Arbitrariness. So it's just arbitrariness, which is different from arbitrariness and capriciousness, which is the Section 706 APA? I guess I would just refer the Court to Morgan on that. Again, a lot of the- We can't just follow Morgan if Morgan doesn't have a basis. We have to know where are we getting this review from and where are we getting the standard from? And, again, I will file a letter after argument more specific on that. I apologize if my answer is not satisfactory. And it's hard to refer, for example, to the discussion you were having before about the drugs, because the original order that we're reviewing doesn't have any drugs. And, obviously, it makes some difference to what it seems to me quite possibly to make some difference to arbitrary and capriciousness, what he's being medicated with, how much, and so on. And the order doesn't say any of that. So if we do have authority to review, I'm reviewing for arbitrariness. How do we do it on an order like that? And the later order does. The emergency order has more to it, but this one doesn't. On which point, Your Honor, again? On medication. On the medication point, I would submit that under-and, again, we would ask this Court to rely on Morgan. The defendant does have to show a certain amount of prejudice here if there was no medication in the actual hearing. There is a box check that says that Dr. Sarrison's treatment was approved. I don't know if it was discussed orally or not, but if you look at SDR 28, it says, Treatment, Proposal, and Justification is one of the things that's checked there. But the only thing in writing that we have is the one from June 21 on that. And so if the defendant was to claim, for example, that there should have been a dosage, we would, again, argue that that's not required necessarily by Harper. But where is the prejudice if he received a prescription before he was medicated? I'll try this out. Let me ask. Could I ask one more question? We're on something I really would like to get clarified. In Hernandez-Vasquez, we interpreted Sell's statement that a determination of medical appropriateness requires an analysis of, quote, specific kinds of drugs that issue, close quote. That's at 539 U.S. at 181. To require that Sell must provide some type of limitation. Now, Harper talks about medical interest. Bell talks about medical appropriateness. And Hernandez-Vasquez sort of identifies that there should be some type of a determination of drugs. Now, I'm not sure that is required in the regulation. So that you can't just say we have to give drugs because there's a danger to other people. We say, and those drugs should be X for at Y amount of time. At least that's what these cases seem to say. So if that's the case, even if we only look at the regulation, we may have to hold it unconstitutional. Unless there's no harm in this case because of the prescription. And I want to have you tell me why it is that you believe the prescription, if in fact that now is a requirement, why the prescription itself would be sufficient to meet the medical appropriateness or medical interest language that the Supreme Court has given us. Your Honor, Harper does not require that dosage that Your Honor mentioned. I guess I would say that that's not required by Harper. So if the regulation omits that requirement, it is not fatal. Secondly, though, medical appropriateness, that's a phrase used in Riggins as well. And I know that we didn't talk about Riggins, but this actually is a good opportunity. Because medical appropriateness is also used when they discuss Harper, for example. And they say, after the finding of overriding justification and a determination of medical appropriateness. Now, it seems like they might be using that as synonymous for medical interest. But what the defendant does is try to take medical appropriateness out of that, use the way that it's used in cell, and then import all of cell into Harper, and that's where we would really have a disagreement. Well, if we have any kind of judicial review, how can we review a blank order? Well, again, I guess I would submit that in writing, first of all, I mentioned, I forgot to mention, the regulation does say the treating and evaluating psychiatrist, and this is at day four, must be present at the hearing and must present clinical data and background information relative to the need for medication. So, you know, again, I think that's why that's checked, that that is done. The prescription itself, even if that's written after, I think we still have what we need. I don't understand. Can a psychiatrist get up and say, this guy really needs some serious psychotropic medication, you know, without saying what it is or what the side effects might be or how it might influence him or anything else? And might that not be sufficient for a medical determination, but a court review? I guess I would say that the medication determination was made. It's just in that prescription from 621, and I don't think that that's anything that is less than what Harper, if this court finds that that's required, anything less than that. I think that that is enough. I really do want to end this, but I do have one more question, which is, did Loxner have any notice of that? Did he have any notice? Did his staff representative know what they were going to give him before the hearing? I can't discern that from the record, Your Honor. You can't. On that last point, though, if I might, on the medical appropriateness, one thing that defendants noted said, you know, if we follow Riggins's language, that somehow there would be no disagreement. I do want to note that some of the language that he discusses, you know, medical appropriateness, it was found to be in his medical interest. Considering less intrusive alternatives, they did consider less intrusive alternatives, essential for the sake of Riggins's own safety or safety of others. They did find that there was a danger to others. So, again, we would submit that the prison did what the prison needed to do, that administrative decision here was sufficient to account for the due process questions at issue. And that the prison's rights of the... Suppose we... So, therefore, if his problem was he was thrown chairs, and if the downsides of this effect was that he was going to be maimed for life, that would be fine. I'm sorry, say that again. If the downsides of the actual medications used were that he was going to be harmed for life, that would all be okay. Well, Your Honor, the bottom line is that the court in Morgan also noted that it will be up to the court, and I think this court already noted that, to decide whether or not he's competent to stand trial. It will be up for the court to decide, so they are going to get judicial review on that. Thank you very much. That was a useful argument. We'll give you, say, four minutes. Because we're all getting very tired. Let me begin with the question that was just being addressed. And in Harper, there were specific set of procedures that were approved, and I tried to find the language in the case while I was listening with one ear and reading, and I couldn't. But my recollection is what the Supreme Court approved was a procedure where one psychiatrist described an actual medication. Another approved it before we even moved forward to the due process hearing that occurred. That was in Washington State. That was the Washington State procedure. Yes. Now, of course, this court decided in Hernandez-Vazquez that a specification of the medication is necessary for any determination of medical appropriateness. That itself undercuts the Morgan decision on which the government relies to approve these sort of blank orders. And, of course, Morgan itself has got to be called into doubt by the Fourth Circuit's later decisions, because Morgan included an order that was both a dangerousness order and a competency order. Since the decision in Sell, Morgan and the Fourth Circuit has abandoned the position that this sort of arbitrariness review governs any sort of competency medication orders. It has, in fact, adopted the clear and convincing standard, and I think the case name is Bush, which we cite in our briefs. So I think Morgan as a precedent is undermined both by this court's decision in Hernandez-Vazquez and the Fourth Circuit's own decision in Bush. So for that reason, we don't think it's in any way controlling or that this circuit would be in conflict with the Fourth if it were to decide our way. Counsel, I know you have some other points. At some point in the two and a half minutes that you have left, I would like you to address the question of how you get or whether you get judicial review from a Harper hearing or a Sell hearing or a Riggins hearing, and if so, what the mechanism is, the same question I asked the government's counsel. And it's a difficult issue. When we were pondering this issue of deciding what to file in the initial case, we came to the conclusion that we're asking the court, the district court, to invoke its supervisory powers as the court that committed the individual to the attorney general's custody for purposes of treatment and maintained supervision of him. And that seems to be the approach that was taken by the Supreme Court itself, where that was an order, an administrative order from the Bureau of Prisons that moved to the district court, through the magistrate, the district court, the court of appeals, and up to the Supreme Court. So putting it under the district court's supervisory powers because the district court committed him would avoid then the problem of deeming any medical decision made by a prison doctor to be a final agency action for purposes of the APA, thus giving us review of all decisions whether to dispense Tylenol or not. It would, Your Honor, but I don't want to go too far down the stroke because I have to confess that I'm very unfamiliar with APA law,  If it's under the court's supervisory powers, what standard of review does the district court use? What standard of review do we use to review, let's say, a Harper hearing? We don't believe that it should be a review as such. We believe, as I said to Judge Wallace, that to the extent that this administrative procedure occurs in the case of a pretrial detainee, it's solely for the internal purposes of the Bureau of Prisons. And they're coming to this court, or to the district court, I apologize, for a de novo decision on whether or not the standards set out in Riggins can be met in medication as appropriate. But if we were to agree in any form at all with the government that there's an administrative proceeding that we're reviewing, then what? Even a different kind of administrative proceeding. Even a different kind of administrative proceeding. You know, it would be a Matthews versus Eldridge question, I think, on what due process we're talking about. But what about those review questions? But even the review question, I think the court would have to determine what Matthews versus Eldridge required as a standard of review of that proceeding. We don't usually engage in a Matthews versus Eldridge balancing when we get appeals of antitrust cases or FERC cases. We have some kind of a statute that gives us jurisdiction and tells us what the standard of review is. It just feels very, very freeform. Or the court, yeah. Well, some of the reason it's not so freeform is the court over the years has developed its standard of review. And, of course, this is a relatively fresh question. Here is de novo? Is it some kind of deference? We would ask for de novo review, Your Honor. We think that that's what's appropriate. De novo review of medical decisions? De novo review of the question of dangerousness, of medical appropriateness. Not of the particular prescribing decisions, but of medical appropriateness is set out in Hernandez-Vasquez. Medical, I mean, de novo review of the question of whether or not less intrusive means will adequately mitigate danger and whether the medication is essential. Psychiatric issues. As you said earlier, but it would be interesting to expand a little bit, civil commitment proceedings are those proceedings, right? If there's a civil commitment request, eventually a court makes psychiatric determinations. Yes. And in the course of doing so, extinguishes the individual's right to avoid treatment and provides the state with a right to provide that treatment, which is, of course, our position of one of the interests that's very different here from the convicted inmate context, where the state has acquired that right and the inmate has lost that right via the criminal conviction. And that's one of the interests that we think the government just doesn't take into account and why it's not enough to say Harper decided these questions. Okay. Thank you all very, very much for this marathon argument. It's been incredibly illuminating. Well done. Excellent arguments on both sides. Very helpful.
judges: Wallace, Berzon, Bybee, Cjjsan Francisco, California